**STATE, EX REL. INDIAN HILL ACRES, INC., Relator, v KELLOGG, ET, Respondents.**

Ohio Appeals, First District, Hamilton County.

No. 6795.  Decided May 5th, 1947.

176

Taft, Stettinius & Hollister, Cincinnati, and John H. More, Cincinnati, for relator.

John D. Ellis and Ed. F. Alexander, both of Cincinnati, for despondents.

## OPINION

By MATTHEWS, PJ.

This is an action instituted in the first instance in this Court, seeking a writ of mandamus, directing the City Manager and the Superintendent of the Water Works Department of the City of Cincinnati, to permit Relator to connect its water main extensions to the water mains in Miami Road, a public street, and to permit consumers of water to be served by such water main extensions and connections and to accept the application of the Relator to make such connections and permit the same to be made.

Stated tersely, the Relator asks that the Respondents, as the officials of the City of Cincinnati, charged with the duty,

be required to supply the Relator with water from the Municipal Water Works, upon compliance by it of the required conditions.

An alternative writ was issued and the cause now comes before this Court upon the Relator's prayer for a mandatory writ in conformity to the alternative writ.

There is substantial agreement on the facts.

The City of Cincinnati during all the time material here has owned and operated a municipal water works, with a capacity in excess of the normal requirements of the municipality and its residents. While there is apprehension that at no distant time its capacity may be taxed to supply the increased needs of the municipality, it is clear that at the present there is a surplus of water and that this surplus is being disposed of to consumers outside the municipality.

Acting under the authority conferred by §6602-17 GC, the County Commissioners of Hamilton County in 1925 established Sewer District No. 1, in which to supply water to the public. They caused to be constructed in Miami Road (then a highway in unincorporated territory in Hamilton County, but now in the incorporated Village of Indian Hill) a sixteen inch water main, as well as other mains, and, as authorized by law, levied an assessment of $2.13 per front foot, plus $25.00 per acre to pay the cost.

The Relator's land consists of forty-three lots of an area of more than one acre each, no part of which is contiguous to the City of Cincinnati. These lots formed a part of a tract of two hundred and thirteen acres assembled by the Relator and its predecessor in title, all located in Sewer District No. 1. This land was acquired between 1929 and 1936 for the purpose of dividing it into residential lots of not less than one acre each, and this has been done, at least in part. The part that has not been subdivided abuts on Miami Road, where the sixteen inch water main was installed.

The Relator and its predecessor in title have paid in the form of assessments the sum of $16,892.59, as their share of the cost of installing this water distribution system in Sewer District No. 1.

In 1935, while this land was still in unincorporated territory, the Relator's predecessor in title, as required by law, filed with the City Planning Commission of Cincinnati, a preliminary plan for its subdivision, which was tentatively approved, and, in 1942, after the land was incorporated as a part of the Village of Indian Hill, the plan was filed with that Village, and tentatively approved by it on January 28th, 1946.

. The investment, including the original cost, plus the cost of constructing roads, streets, sewers, etc., totals somewhere between a quarter and a half million dollars. A very substantial portion of this cost was incurred in constructing water main extensions under the supervision of and in accordance with the plans of the Water Works Department of the City of Cincinnati, and with the purpose of securing the supply of water through the water main previously constructed in Miami Road.

In 1925, when the County Commissioners created Sewer District No. 1 and laid out the water distribution system therein, they entered into a contract with the City of Cincinnati to provide the water for this district and eight others. On October 10th, 1930, a new contract was substituted. This contract was to expire on May 29th, 1946, and provided that the City of Cincinnati should furnish water from its surplus at one and one-half the price charged by it to its residents, which it would collect directly from the users in Sewer District No. 1.

After May 29th, 1946, the City of Cincinnati continued and still continues to furnish water to residents in Sewer District No. 1, to whom it was supplying water on that date.

In making this contract with the County Commissioners to supply water for the distribution system in Sewer District No. 1, the City of Cincinnati acted under the general authority conferred by **Sec. 6 of Art. XIII of the Constitution of Ohio,** which authorizes municipalities to own and operate waterworks systems to supply water for the use of its residents and to sell to others outside of the municipal limits any surplus not exceeding fifty per cent of the total furnished to others. By §6602-17 GC municipalities are specifically authorized to sell their surplus water to water supply systems established by counties.

In August, 1946, the Relator applied to the Water Works Department for leave to attach or have attached the water main extensions, which it had constructed in Miami Road, so that it would become a part of the water distribution system of Sewer District No. 1 and the Relator's property served with water on the same terms as it was served to all others in said district. When this application was placed before the Council of the City of Cincinnati in the form of a proposed ordiance, authorizing the connection, the Council refused to adopt it. In November, 1946, the Relator made written demand upon the Respondents for this service, which was refused on January 18th, 1947, on the ground that as the Relator refused to comply with Ordinance 164-1946, they were not authorized to com-

ply with the request. By Section 1 of that Ordinance, the City Manager was authorized to continue for a period of five years from May 29th, 1946 in accordance with the terms of existing contracts, except as modified by such ordinance, to supply water, from such surplus as it might have, to areas outside the City of Cincinnati at the rate of fifteen cents per one hundred cubic feet, with the proviso, however, that no water should be furnished through any extension of existing mains outside the City. There was the further limitation imposed that whenever an owner of land outside the City, which is so located that it should become a part of the City, makes a binding commitment on behalf of himself and subsequent owners to sign any petition or other document necessary to procure annexation of the land and to do all things necessary or proper to bring about the annexation of the land, then the City Manager should report such facts and his recommendations to Council for their consideration as to whether water should be furnished to such owner. This ordinance expressly reserved the right of council to furnish water outside the City limits without such commitment, where a denial would cause great hardship or serious economic social disadvantage to the community.

Since May 29th, 1946, the Council has adopted forty-six ordinances authorizing the City Manager to supply water, through water main extensions to be constructed, to owners outside the City who had committed themselves to cooperate in proceedings to annex their land to the City as required by Ordinance 146-1946. In one instance he was authorized to sell water to an owner outside the City on the basis that a denial would result in great hardship and serious economic and social disadvantage to the community. None of these instances, however, was in Sewer District No. 1. The Relator refused to commit itself to cooperate in annexation proceedings. It is assured that it would have been furnished water had it so committed itself.

As the others in Sewer District No. 1 are being furnished water without being required to commit themselves to cooperate in annexation proceedings, we pass by without deciding the interesting question as to the validity of a contract purporting to commit a citizen to cooperate in the desire of municipal officials to enlarge the municipal territory and authority. Valid or not, it, the Relator's refusal to sign a commitment was the only reason assigned for the Respondent's refusal to furnish water.

As we view this case, it does not involve the general ques-

tion of the right of any owner of land outside Cincinnati to have water supplied to him by Cincinnati, nor even the right of any owner of land in Hamilton County outside of Sewer District No. 1. The question, as we see it, is the limited one of the right of an owner of land in Sewer District No. 1 to have water furnished to his property upon the same terms and conditions as it is being furnished to the other owners of land in that district. Whether in some other relation the reason assigned for the refusal would be valid per se is of no consequence.

That an effective sewer disposal and water distribution system relates to the public health and, therefore, is a proper object of government, no one disputes at this late day. While the limits of the police or sovereign power are often disputed, that they include every exertion that has any reasonable tendency to prevent disease and promote health, are never the subject of argument. The power to enact all laws having any relation to those subjects is a part of the power expressly reserved to the State by the Xth Amendment of the Constitution of the United States. However, this power must be exercised in conformity to the limitations upon state power imposed by other provisions of the United States Constitution, among which are the provisions of the XIVth Amendment, that no state shall deprive any person of life, liberty, or property without due process of law nor deny to any person within its jurisdiction the equal protection of the law. And the sovereign people of the state have recognized these limitations upon their power by expressly imposing by Sections 2 and 19 of the Ohio Constitution these same limitations upon the agencies of government instituted by them.

So the City of Cincinnati by virtue of the power delegated to municipalities in the Ohio Constitution to exercise all local police power (**Sec. 3 of Art. XVIII**) not in conflict with general laws, and to own and operate a water works system (**Sec. 6 of Art. XIII**) was and is fully authorized to make distribution of the water and own and operate the facilities necessary or convenient to accomplish that purpose limited, however, geographically by the municipal boundaries and constitutionally by the provisions that forbids the power to be so exercised as to deny to any person due process of law or the equal protection of the law. There must be no discrimination. This does not prevent the classification of users of water within the City and regulation of use and rates according to classes, but the classification must be based on actual and substantial distinctions and all within the same class must be served without

discrimination. Those similarly situated must be similarly treated.

When the City of Cincinnati engages in the supplying of water to the residents within its border, it is performing a governmental function. We are not concerned here with the distinction between governmental capacity and proprietary capacity for the purpose of fixing tort liability. Regardless of that distinction, the City is exercising the sovereign power of the State when it is engaged in such enterprise, it must do so without discrimination. It is not authorized to enter into the private business of supplying water. No such power has been conferred upon it. However, if in the exercise of the governmental function of supplying water to its residents, a surplus is found to exist, it becomes the owner of that surplus, and as it is not used or useful for any governmental purpose within the municipality, it may be disposed of as any other property of which it may become the owner, for which it has no public use. It is an exercise of governmental power to dispose of such property, but upon the sale of such property, the governmental function ceases. On this subject, it is said in 37 Am. Jur., at 748, that:

" * * * * where, as a necessary result of carrying on a legitimate public enterprise in a reasonably prudent manner, a surplus of the material used or distributed is acquired, or a by-product created, a municipal corporation may lawfully engage in the business of disposing of such surplus or by-product for profit, without special legislative authority."

Speaking of the status of surplus property (water power and electric energy) acquired in the exercise of the power of government, Chief Justice Hughes said in Ashwander v Tennessee Valley Authority, 297 U. S., 288, at 333 and 334, that:

"That the water power and the electric energy generated at the dam are susceptible of disposition as property belonging to the United States is well established. In the case of Green Bay Canal Co. v Pattern Paper Co., supra, the question of 'whether the water power, incidentally created by the erection and maintenance of the dam and canal for the purpose of navigation in Fox River' was 'subject to control and appropriation by the United States, owning and operating those public works, or by the State of Wisconsin, within whose limits Fox River lies.' Id., pp. 68, 69."

* * * * * *

"and that it was 'equally plain that the mode and extent of the use and enjoyment of such property by the Canal Company' fell within the sole control of the United States."

And on the subject of sale of property once devoted to a public purpose, but no longer used or useful for said purpose, it is said in 3 McQuillin Municipal Corporations (2nd ed.) at pp. 751 and 752, that:

"Property devoted to a public use cannot be sold or leased without special statutory authority, although property which has ceased to be used, or is not used, by the public, may be sold or leased as the public welfare may require. * * * * Municipal corporations hold all property in which the public is interested, such as streets, alleys, public squares, commons, parks and wharves, in trust for the use of the public, and on principle, such trust property can no more be disposed of by the municipality than can any other trust property held by an individual."

Both by constitutional provision and by statute, the State of Ohio has recognized that surplus water beyond the municipal needs might result from the operation of a waterworks system, and has provided that such surplus could be sold, but that authority to sell did not transmute the local municipal sovereign into a roving sovereign following the stream beyond the city limits into the domain of other rulers. It shed the regal panoply when it stepped beyond the municipal boundaries. Notwithstanding this power to sell the surplus water, it could not supplant the governmental power of the political subdivision into which the water might be taken. If it entered the territory of other political subdivisions in order to sell its surplus, it did so as an owner of property for which it had no public use seeking a purchaser or purchasers in a locality over which it had no governmental power.

Likewise in matters that are of county-wide concern, the policy making power has been delegated to the board of commissioners, and specifically has this power been confided to such board in the matter of establishing sewer districts and water distribution systems, and providing by contract or otherwise for a supply of water. While the power to divide the county into districts is conferred, this power must not be exercised arbitrarily. The district bounds must be drawn with some reasonable relation to topography and habitation, so as to include to a practical degree all those similarly situated. And when the district is established, all those residing within its bounds must be served without any discrimination.

While the county commissioners are given the power to contract with a municipality for water and the municipality is authorized to sell water from its surplus, it is the county commissioners that exercise the sovereign power of the state in determining whether there shall be established and operated a sewer disposal and water distribution system within the unincorporated portion of the county and it is to the county commissioners that has been delegated the auxiliary power of taxation, assessment and eminent domain to effectuate the policy determined by them. When the City of Cincinnati entered the unincorporated portion of the county, it did so in its own right, as a vendor of surplus water only and whatever it has rightfully done in distributing water to the residents of the district has been as an agent of the county commissioners. It was and is without power to establish a county sewer district or to determine how such district shall be operated. That power rests in the board of county commissioners and it is prevented from discrimination by constitutional provisions. The board itself must not discriminate, and what it cannot do itself, it cannot authorize any other person or corporation to do.

We believe the principles announced in the case of **Western Reserve Steel Co. v Village of Cuyahoga Heights, 118 Oh St 544,** are controlling here. The facts in that case were that the Village of Cuyahoga Heights secured the water for its water distribution system from the City of Cleveland under a contract containing a provision that if a user of water failed to pay the City of Cleveland for the water, the City of Cleveland should turn off the water, and then the Village of Cuyahoga Heights would pay the City of Cleveland for the water, in which event the City of Cleveland would not turn the water on again for the delinquent consumer or for anyone holding title through such consumer, unless the Village of Cuyahoga Heights consented. A consumer defaulted was adjudged a bankrupt and the premises to which the water had been supplied were sold to Western Reserve Steel Co. The water bill not having been paid, the Village of Cuyahoga Heights refused to consent to the turning on of the water connecting with the premises. Neither the contract nor any ordinance made the unpaid water bill a lien upon premises where the water had been consumed. The suit was to require that the water be turned on. The Court held, as stated in the syllabus, that:

"1. It is the duty of a municipality which undertakes to supply water to its public to do so without discrimination. The duty arises out of such undertaking, regardless of the mode

184

adopted to accomplish such purpose. The municipality cannot absolve itself of such duty by a contract to which the person sought to be discriminated against and to whom it owes the duty is not a party.

"3. When a municipality contracts to supply water to the public of another municipality, it dedicates itself in that respect to the service of the public of such other municipality and, while it may limit, by contract, the scope and extent of its duty to the municipality as such, it cannot, while enjoying the privileges and immunities of a public utility, by such contract absolve itself from the duties toward such public that are cast upon it by law by reason of such dedication."

And at pp. 549 and 550, the Court said:

"With the reference to the two municipalities themselves, the city of Cleveland and the village of Cuyahoga Heights, the contention of the defendants in error is probably tenable. It is probably true that neither could enforce performance by the other without performance or tender of performance to the other, for, in respect to supplying water to each other and each other's public, they owed no duty except such as they might impose upon themselves by contract. But when a municipality, under the authority conferred upon it by the Constitution, engages in the operation of a public utility, it enters that field burdened with the same duties and subject to the same restrictions, in respect to the public of the territory served, as would apply to and govern a private corporation similarly engaged; and especially where it engages in such enterprise extra territorium is its relationship to the public shorn of sovereign prerogative."

It is true that a factual distinction exists in that Western Reserve Steel Co. v Village of Cuyahoga Heights involved a contract between two municipalities, but we do not perceive where a municipal corporation owes any greater duty to serve its residents with water without discrimination than do county commissioners to serve the residents of a sewer district, established by them for the sole purpose of furnishing that service. It is also true that the contract involved in that case was for an unexpired term, whereas, the original contract between the City of Cincinnati and the County Commissioners was for a term of twenty years, which had elapsed. However, Cincinnati continued to supply water to consumers within Sewer District No. 1 through the water distribution system established by

the county commissioners in the exercise of their governmental powers. Cincinnati could do this only by the consent of the county commissioners—in other words, it was done as a result of a contract, tacit or express, between the two political agencies. Whether the contract was for a definite term, or only at will, is entirely unimportant. The important and controlling element is that the County Commissioners through the City of Cincinnati are furnishing a public service and under constitutional provisions are not permitted to discriminate among those similarly situated.

For these reasons a peremptory writ of mandamus will be issued in conformity to the alternative writ heretobefore issued.

MATTHEWS, PJ, and HILDEBRANT, J, concur in Syllabus, Opinion and Judgment.

ROSS, J, concurs in Syllabus and Judgment in separate memorandum.

## MEMORANDUM

By ROSS, J. (concurring)

I concur in the conclusion of my associate, Judge Matthews.

It is stated in the 2nd paragraph of the syllabus in **City of Barberton v Miksch, 128 Oh St 169:**

"In the construction and maintainance of a system for supplying water to its inhabitants, a municipality acts in a proprietary capacity."

See, also: **City of Salem v Harding, 121 Oh St 412, 417.**

I consider certain statements made in the opinion of my associates to be in conflict with these authorities.

In **Cleveland Ry. Co. v Village of North Olmsted, 130 Oh St 144, at page 148** of the opinion, where the Barberton case is cited with approval, it is stated:

"This court held, in the first paragraph of the syllabus in **State, ex rel. White, v City of Cleveland, 125 Oh St 230,** 181 N. E., 24, 86 A. L. R., 1172:

" 'A municipality, in so far as it acts in a proprietary capacity, possesses the same rights and powers and is subject to the same restrictions and regulations as other like proprietors.' "

In **Western Reserve Steel Co., et al. v Village of Cuyahoga Heights, et al., 118 Oh St 544, at page 552** of the opinion it is stated:

186

"At the same time, because of its having entered the field of public utilities, there developed upon the city of Cleveland certain duties toward the public of the territory it had undertaken to serve that were cast upon it, not by the contract, but, because of the contract, among which was the duty to serve the utility to the public of the designated territory without discrimination, from the performance of which duty it could not absolve itself except by contract with the person to whom it owed the duty."

Many authorities are cited in support of this statement. The principle is incorporated in the syllabus quoted in the opinion of my associate.

The City of Cincinnati having seen fit in its proprietary capacity to assume to furnish water to some residents in District No. 1, Hamilton County, is subject to the same restrictions against discrimination as would apply to any public utility assuming a similar service.

Under such circumstances, therefore, those residents of District No. 1, who are refused a service granted to other residents, may have the benefit of a writ of mandamus, through which such discrimination may be eliminated.